**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| JOSEPH DEAN, | |
| *Plaintiff,* | CIVIL ACTION |
| v. | NO. 19-4266 |
| PHILADELPHIA GAS WORKS, | |
| *Defendant.* | |

**PAPPERT, J.**                                                                                    **June 28, 2021**

<u>**MEMORANDUM**</u>

 Joseph Dean sued Philadelphia Gas Works, his former employer, claiming that PGW discriminated and retaliated against him in violation of Title VII of the Civil Rights Act and the Pennsylvania Human Relations Act. He also alleges PGW subjected him to a hostile work environment in violation of Title VII. PGW moves for summary judgment on all claims. After thoroughly reviewing the Parties' submissions and record evidence, and holding oral argument, the Court grants the Motion in all respects.

I

A

 PGW hired Dean, a white male, as a Field Services Helper in December of 2017. (Pl.'s Statement of Undisputed Material Facts ("SUMF") ¶ 1, ECF 43-2); (Def.'s SUMF ¶ 1, ECF 41-1.) Helper is an entry-level, unionized and twelve-month probationary position. (May 27, 2021 Hr'g Tr. 5:21–6:10, 7:6–17, ECF 58); (Def.'s SUMF ¶¶ 3, 7). Helpers assist more senior Field Services employees with their duties, which include fixing gas leaks and other customer issues. *See* (May 27, 2021 Hr'g Tr. 7:1–17.)

1

Helpers must earn a promotion to Field Service Cadet, a position that handles service calls independently, to remain employed with PGW beyond their probationary term. (Pl.'s Ex. 1, Dean Dep. Tr. 49:6–12, ECF 43-3)[1]; (Def.'s SUMF ¶ 8). According to Dean, to be promoted a Helper must pass an Operator Qualification test required by the Department of Transportation Pipeline Hazardous Materials Safety Administration. (Pl.'s Ex. 1 at 49:13–20.) According to PGW, Helpers must *both* pass the OQ test *and* successfully complete Cadet School. (Def.'s SUMF ¶ 9)[2]; (Def.'s Ex. F, Def.'s Answer to Interrogatories 6, ECF 41-3.) Cadet School includes eight days of classroom training during which Helpers are given quizzes worth fifty percent of their overall school score. *See* (Def.'s Ex. F 9). After classroom training, Field Specialists train Helpers in the field for at least fifteen days. (*Id.*) Helpers who struggle with field work may receive three additional training days. (*Id.*) At the end of all training, Helpers take a final examination worth the remaining fifty percent of their overall score. (*Id.*) PGW claims Helpers must achieve an overall score of at least seventy to

---

[1]     Dean relies mostly, if not entirely, on his own deposition testimony to support his claims.

[2]     Dean disputes much of PGW's Statement of Undisputed Material Facts, including paragraph nine, arguing it is supported by testimony or documents generated by PGW employees who he says are interested witnesses. *See generally* (Pl.'s Resp. to Def.'s SUMF, ECF 43-1). He argues the Court must ignore all "interested witness" testimony that a jury would not be required to believe even if the testimony is uncontradicted. (*Id.* at ¶ 5); (Pl.'s Resp. to Mot. for Summary Judgment 9–11, 15–16, 18, 23, ECF 43-4). That is not the law, something Dean's counsel acknowledged at oral argument. *See* (Def.'s Reply 1–3, ECF 45); (May 27, 2021 Hr'g Tr. 82:12–83:3, 85:6–11, 87:17–20). The Third Circuit Court of Appeals instructs that "in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible even if the testimony is that of an interested witness." *Lauren W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007); *see also Garcia v. Newtown Twp.*, 483 F. App'x 697, 699 n.3 (3d Cir. 2012) ("As we are reviewing a grant of summary judgment, we recount the material facts in the light most favorable to Garcia as the nonmoving party . . . . We do, however, consider credible evidence submitted by the moving party that is essentially uncontradicted.").

complete Cadet School "successfully." (Def.'s Ex. L, Dean Training Report); (Def.'s Mot. for Summary Judgment 6, ECF 41-2.)

B

Between June and August of 2018, before he began Cadet training, Dean reported white co-worker Dylan Rutledge to a union representative and two Field Operations Supervisors for making racist remarks about African Americans. (Pl.'s SUMF ¶¶ 3–5.) Among other comments, at one point Rutledge called Dean a n***** lover. (Pl.'s Ex. 1 at 39:12–18, 40:15–23.) PGW investigated Rutledge's conduct, including by interviewing Dean and other union employees, and fired Rutledge on September 10 for using racial epithets. *See* (Pl.'s SUMF ¶¶ 7–9); (Def.'s Ex. X, Rutledge Termination Ltr.). Dean believes Rutledge is PGW supervisor Gerard Gaydosh's nephew, (Pl.'s Ex. 1 at 97:4–6)[3], and says after he reported Rutledge he was harassed and intimidated at work, *see* (Def.'s June 15, 2021 Ltr. to Court, Dean Dep. Tr. 152:1–10, ECF 61 (claiming Specialists told him "you don't mess with Gerry Gaydosh's people")). Before Dean participated in PGW's investigation, union representatives Joseph Cipparone and Michael Hudson told him "change your story or else you will know what is good for you." (Pl.'s Ex. 1 at 46:15–18); (Pl.'s SUMF ¶ 10.) After Rutledge was fired, an "atmosphere of harassment and intimidation pervaded [Dean's] entire [Cadet] training." (Pl.'s Resp. to Mot. for Summary Judgment 18.)

Dean began Cadet School the same day PGW fired Rutledge, and he claims on his second day Cipparone and Hudson told his class he was a "rat and a snitch." (Pl.'s

---

[3]     The record does not conclusively establish that Rutledge and Gaydosh have a familial relationship. *See* (May 27, 2021 Hr'g Tr. 10:25–11:4, 20:18–25). One of Dean's union representatives also "heard" the two are related. *See* (Pl.'s June 15, 2021 Ltr. to Court, Hudson Dep. Tr. 43:3–10, ECF 62-1).

SUMF ¶¶ 11, 13.) Specialists called Dean a rat and a snitch throughout his field training, sometimes instead of answering his questions and once while he was undergoing an evaluation. (*Id.* at ¶¶ 21–22.)[4] Other employees also called him a rat and a snitch throughout training and told him he was not going to make it. (*Id.* at ¶ 28.) Dean says he told a supervisor he was being harassed and retaliated against for reporting Rutledge three or more times during Cadet School but the harassment continued. (Pl.'s SUMF ¶¶ 24, 31); (Pl.'s Ex. 1 at 55:23–56:24, 60:16–19.) The supervisor does not recall these reports. *See* (Def.'s Ex. O, Baldwin Dep. Tr. 26:4–10); (Def.'s Ex. Z, Rohrer Investigation Summary Report).

Once during training, employees falsely accused Dean of having the answers to the OQ test. (Pl.'s SUMF ¶ 25.) PGW labor relations met with Dean on September 21, 2018 because management received reports Dean was bragging about having the test answers and claiming he was related to PGW CEO Craig White. *See* (Def.'s Ex. G, McDonald Dep. Tr. 65:8–17, 66:10–12, 69:14–19). Dean was not disciplined for the OQ test answer allegations, (Def.'s SUMF ¶¶ 16–17), but he claims that after the meeting White walked up to him, told him he was a "disgrace to the white race" and walked away. (Def.'s June 15, 2021 Ltr. to Court, Dean Dep. Tr. 134:10–135:9.) He did not report White's comment to anyone after it happened. (Def.'s June 15, 2021 Ltr. to Court, Dean Dep. Tr. 135:16–19.)

C

Dean performed poorly in Cadet School. He failed several quizzes, received a forty-eight on his final exam and achieved an overall Cadet School score of sixty-two.

---

[4] At oral argument counsel claimed Dean was called a rat and a snitch during Cadet School testing, but nothing in the record supports this. *See* (May 27, 2021 Hr'g Tr. 58:25–59:6, 90:12–16).

*See* (Pl.'s SUMF ¶ 14); (Def.'s SUMF ¶ 21); (Def.'s Ex. J, Dean OQ Examination Transcript); (Def.'s Ex. K, Dean Fail Cadet School Exams); (Def.'s Ex. L, Dean Training Rpt.). Dean says his exams "were administered under a cloud of harassment and intimidation, which began on September 11, 2018," and "were not graded impartially." (Pl.'s Resp. to Def.'s SUMF ¶¶ 19–20.) PGW points out the exams were multiple choice or otherwise objective. (Def.'s SUMF ¶ 20); (May 27, 2021 Hr'g Tr. 9:5–11, 30:9–18); *see also* (Def.'s Ex. K).

Dean fared no better in field training. He received the three additional training days after Specialists repeatedly reported he was "not ready for the field" during his first fifteen, though he says he received extra time only to make up testing he missed while at his September 21 meeting with labor relations . *See* (Pl.'s Ex. 1 at 57:1–20); (Def.'s Ex. H, Dean Termination Ltr.); (Def.'s Ex. L). After his training ended, a Field Training Supervisor evaluated Dean on October 19 and concluded he "lacks the judgment and aptitude required to safely perform the duties of a Field Service Cadet." (Def.'s Ex. M, Dean Field Evaluation.) Among other things, the Supervisor noted Dean failed to locate or discover two gas leaks, which is a "main objective to maintain safety for [employees] and for the customers." *See* (*id.*); (May 27, 2021 Hr'g Tr. 9:20–22).

Notwithstanding his Cadet School performance, Dean believes he was promoted to Cadet on October 15, 2018 because he passed his OQ test and claims on that day he received a pay raise, a route to independently handle service calls, authorization to use a PGW vehicle without supervision and a locker. *See* (Pl.'s SUMF ¶¶ 19, 35); (Pl.'s Ex. 1 at 75:2–13, 76:2–5, 164:5–165:2). His service card, the only record evidence of his compensation, does not show a change in job title or pay raise in or around October of

2018. (Def.'s Ex. A, Dean Service Card); (May 27, 2021 Hr'g Tr. 68:13–15.) PGW says

Dean never received a promotion, and to the contrary after Dean's field evaluation a

Manager arranged to assign him "filing and general clerical work" away from the field.

*See* (Def.'s Resp. to Pl.'s SUMF ¶ 19); (Def.'s Ex. N, Delgado Aff. ¶ 43.)[5]

D

Dean says he spoke on October 29 with the same supervisor to whom he

previously reported experiencing harassment and retaliation and the supervisor

recommended he contact Human Resources Senior Business Partner Mathew Rohrer.

(Pl.'s SUMF ¶ 33); (Pl.'s Ex. 1 at 60:20–61:1, 61:19–62:13, 74:3–8.) Dean called Rohrer

on October 30 around 8:00 or 9:00 a.m., and Rohrer interviewed him in person around

12:45 p.m. that day. (Pl.'s SUMF ¶ 32); (Pl.'s Ex. 1 at 62:5–22.) During the interview,

Dean told Rohrer union employees had been retaliating against him ever since he

reported Rutledge and he believed he was going to be fired because of the report. (*Id.* at

62:18–22); (Def.'s SUMF ¶ 37.)[6] Dean also filled out a Complaint Intake Form, where

---

[5]    PGW included four affidavits in the summary judgment record and cites to each in its Statement of Undisputed Material Facts. The Court has limited its consideration of the affidavits because three aver the statements in them are "true and correct to the best of" the affiant's "knowledge, information and belief," *see* (Def.'s Ex. N ¶ 66); (Def.'s Ex. Q, Smith Aff. ¶ 33); (Def.'s Ex. Y, McDonald Aff. ¶ 30), which "renders the [affidavits] non-compliant with Rule 56(c)(4)'s requirement that the allegations be based on personal knowledge with a showing of proper foundation for the testimony." *Green v. Didio (In re Didio)*, 607 B.R. 804, 821 (Bankr. E.D. Pa. 2019) (disregarding a "complaint/affidavit" in deciding summary judgment motion because affiant verified allegations as "true and correct to the best of my knowledge, information and belief"); *see also Pellegrino v. McMillen Lumber Prods. Corp.*, 16 F. Supp. 2d 574, 585–86 (W.D. Pa. 1996) (disregarding paragraph of affidavit made to "best of" affiant's "knowledge, information and belief" not based on personal knowledge and stating affidavit was "critically deficient" because it "d[id] not purport to set forth statements made upon [affiant's] own personal knowledge."). Specifically, the Court has considered only those statements in each affidavit that are clearly based upon the affiant's personal knowledge.

[6]    Dean objects to this paragraph of PGW's Statement of Undisputed Facts because it relies in part on Rohrer's deposition testimony about his conversation with Dean, which Dean says is hearsay. (Pl.'s Resp. to Def.'s SUMF ¶ 37.) Federal Rule of Evidence 801(d)(2)(A) "provides that statements made by a party to an action and offered into evidence by an opposing party do not

6

he wrote that after he reported "someone who was racist and uncle is a big shot" he was being called a rat and a snitch, told he would not make it and was once falsely accused of having OQ test answers. (Pl.'s Ex. 1 at 72:22–73:10); (Def.'s Ex. T, Dean Complaint).

Dean was fired several hours after his interview. (Pl.'s Ex. 1 at 81:4–17); (Def.'s SUMF ¶ 39.) PGW told Dean it was firing him because of his performance, (Pl.'s Ex. 1 at 67:14–15, 81:4–7, 81:15–17), and PGW says although the timing of Dean's termination aligned with his complaint it had decided to fire him before he complained, *see* (Def.'s SUMF ¶¶ 27–29, 39); (Def.'s Mot. for Summary Judgment 1).

i

According to PGW's Director of Corporate Labor Relations, all Helpers who do not successfully pass Cadet School are terminated. (Def.'s Ex. G at 44:18–45:9.) Once field services and labor relations receive information about employees' Cadet School performance, management arranges separate meetings with those who failed to inform them about their performance and fire them. *See* (*id.* at 44:18–45:9, 45:13–46:25); (Def.'s SUMF ¶ 27). After management learned Dean performed poorly on his exams and during his field evaluation, the Director of Corporate Labor Relations, Senior Vice President of Human Resources, Labor and Corporate Communications, Director of Employee Relations, Development and Support Services, Manager of Labor Relations, and Manager of Field Services Administration decided to terminate Dean. (Def.'s Ex. G at 44:12–17.) They say their decision was because of his poor performance. *See* (Def.'s Ex. G at 50:15–51:19); (Def.'s Ex. N ¶ 55); (Def's Ex. Q, Smith Aff. ¶ 20).

---

constitute hearsay." *United States v. Reilly*, 33 F.3d 1396 1411 (3d Cir. 1994) (citing Fed. R. Evid. 801(d)(2)(A)). Rohrer's testimony is not hearsay because it concerns statements purportedly made by Dean.

Similarly, a November 7, 2018 letter from PGW to Dean says he was fired "as a result of [his] failure to successfully complete the required promotional training process during [his] probationary period." (Def.'s Ex. H.) None of the employees Dean claims harassed him had any input into the termination decision. *See* (Def.'s Ex. G at 44:12–17); (May 27, 2021 Hr'g Tr. 12:22–25). The Manager of Field Services Administration called Dean's union representative on October 29 to tell him management scheduled an October 30 meeting to discuss Dean's performance. (Def.'s SUMF ¶ 28); (Def.'s Ex. N ¶ 48.) And Rohrer knew, after Dean called him the morning of October 30 but before he interviewed Dean at 12:45, that PGW intended to fire Dean that day. (Def.'s Ex. P, Rohrer Dep. Tr. 89:5–23.)

ii

Dean rejects PGW's explanation for his termination and believes the employees who harassed him set him up for failure in order to fire him under the guise of poor performance. *See* (Pl.'s Resp. to Def.'s SUMF ¶¶ 19–20); (Pl.'s Resp. to Mot. for Summary Judgment 6–7, 11). He claims he had no idea on October 30 that his job performance was at issue. (Pl.'s SUMF ¶ 34). PGW responds Dean should have been aware his performance was unsatisfactory as early as September 11, 2018 when he failed his first Cadet School quiz. (Def.'s Mot. for Summary Judgment 13.) It contends Dean *was* aware he was a poor performer because he expressed concerns to a Supervisor and a Manager, before October 30, that he would be fired. (Def.'s SUMF ¶¶ 25–26.)

E

Following Dean's termination, Rohrer says he investigated every allegation in Dean's complaint. On November 30, 2018, he wrote Dean a letter saying he was unable to substantiate Dean's claim that Specialists made threatening or inappropriate remarks to him. (Def.'s SUMF ¶ 52); (Def.'s Ex. P, Rohrer Dep. Tr. 103:21–104:6); (Def.'s Ex. Z); (Def.'s Ex. AA, Rohrer Investigation Findings Ltr.) Rohrer also concluded Dean was terminated because of his job performance. *See* (Def.'s Ex. AA). Dean says that other than this letter, he did not hear from PGW management after his termination. (Def.'s SUMF ¶ 55.)

F

Dean nonetheless believes PGW employees contacted or watched him after he was fired. He claims Hudson called him on October 31, 2018 to say he got "what n***** lovers deserve." (Pl.'s SUMF ¶ 39.) He says he called Rohrer to report this incident and Rohrer said he could not help him. *See* (Pl.'s Ex. 1 at 69:7–12); (Def.'s Ex. B, Dean Dep. Tr. 86:18–21). Rohrer does not remember this call. (Def.'s Ex. P at 160:5–23.) Dean believes Hudson called him again several times in June of 2019 because he received calls from an unknown number and the caller would hang up when Dean said "Michael Hudson." (Def.'s Ex. B at 84:1–85:21.)

Dean also says PGW vehicles parked on or near his street twice in December of 2018 on occasions when he believes PGW had no nearby service calls, *see, e.g.*, (Pl.'s SUMF ¶¶ 42–43), though he did not verify this with all of his neighbors, (Pl.'s Ex. 1 at 92:3–93:8).[7] He saw a PGW vehicle on his street again in March of 2019. *See* (Pl.'s

---

[7]     Dean also claims that on December 7, 2018 a white man in a PGW supervisor's vehicle pulled up next to him and "pointed his finger like a gun like he was going to shoot me." (Pl.'s Ex. 1 at 89:4–13.) Counsel did not mention these details in its letter to PGW, *see generally* (Def.'s Ex. CC), and no further record evidence of this particular incident has been provided to the Court.

SUMF ¶ 44); (Def.'s SUMF ¶ 64).[8]  He further claims on May 29, 2019 he encountered Gerard Gaydosh on the highway, who drove up next to him and pointed his finger and hand at him.  (Pl.'s SUMF ¶ 45); (Pl.'s Ex. 1 at 96:20–97:3.)[9]

G

After he was fired, Dean filed two EEOC charges against PGW.  His first charge, filed on February 21, 2019 alleged discrimination and retaliation during his employment.  (Pl.'s SUMF ¶ 38); (Def.'s Ex. DD, Dean First EEOC Charge.)  His second, filed on June 28, 2019 alleged retaliation based on his post-termination experiences. (Pl.'s SUMF ¶ 48); (Def.'s Ex.  HH, Dean Second EEOC Charge.)

Dean filed this lawsuit on September 17, 2019 (ECF 1) and amended his Complaint on July 23, 2020 (ECF 34).  In his amended pleading, Dean alleges the harassment he experienced at PGW from when he reported Rutledge until he was fired created a hostile work environment and both the harassment and his termination constituted race-based discrimination and retaliation under Title VII and the PHRA. *See* (Am. Compl. ¶¶ 92–110).  He further claims the post-termination harassment and surveillance he believes PGW employees subjected him to was retaliatory in violation of Title VII and the PHRA.  *See* (*id.* at ¶¶ 99–102, 107–110.)

PGW argues each of Dean's claims fail as a matter of law because "[i]n reality, Dean was simply a probationary employee who could not pass the objective job

---

[8]    PGW contends that on March 8, 2019, one of the days Dean saw a PGW vehicle on his block, a PGW technician was working on a residential heater job nearby.  *See* (Def.'s SUMF ¶ 65); (Def.'s Ex. EE, March 8, 2019 Order Details).  Dean disputes this and suggests PGW could have fabricated this information.  (Pl.'s Resp. to Def.'s SUMF ¶ 65.)

[9]    Gaydosh says he drove his car to work that day with only one detour to a 7-Eleven, and he does not acknowledge having seen Dean.  *See generally* (PGW Ex. GG, Gaydosh Aff. and GPS Records.).

performance standards required for him to continue his employment with PGW past his probationary period, and he was terminated along with other probationary employees who failed to meet these standards." (Def.'s Mot. for Summary Judgment 1.) Additionally, Dean's alleged post-termination experiences fail to sufficiently support a retaliation claim. (*Id.* at 16–19.)

## II

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). The movant bears the initial responsibility of informing the Court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *See Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 145 (3d Cir. 2004), holding modified by *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500 (3d Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it may affect the outcome of the suit under the governing law. *Id.* at 248. A mere scintilla of evidence supporting the nonmoving party will not suffice for a court to deny summary judgment. *Id.* at 252. Rather, the nonmovant must "set forth specific facts showing there is a genuine issue for trial." *Id.* at 256.

At summary judgment, a court may consider any material in the record that may be admissible at trial. *See* Fed. R. Civ. P. 56(c); *Pamintuan v. Nanticoke Memorial*

*Hosp.*, 192 F.3d 378, 387–88 & n.13 (3d Cir. 1999). In doing so, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009) (citation and quotation marks omitted). But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). Nor may a court make credibility determinations or weigh the evidence. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

## III

Title VII and the PHRA prohibit employers from discharging or discriminating against employees with respect to the terms, conditions or privileges of employment because of their race, color or national origin. *See* 42 U.S.C. § 2000e-2(a); 43 P.S. § 955(a). Analyses of Title VII and PHRA violations are "identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." *Huston v. P&G Paper Prods. Corp.*, 568 F.3d 100, 104 n.2 (3d Cir. 2009) (quoting *Weston v. Pennsylvania*, 251 F.3d 420, 426 n.3 (3d Cir. 2001)); *see also Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).

## A

Discrimination claims under Title VII and the PHRA are governed by the burden shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 252–53 (1981); *see also Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003); *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841 (3d Cir. 2016) (collecting cases). To establish a *prima facie* case for discrimination against an employer, a plaintiff must show: (1) he belongs to a

protected class; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the circumstances surrounding the adverse employment action give rise to an inference of discrimination. *See Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).

Once a plaintiff establishes a *prima facie* case, "the burden of production . . . shifts to the defendant to offer a legitimate non-discriminatory [justification] for the adverse employment action." *Burton*, 707 F.3d at 426 (quoting *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009)). "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Id.* (citing *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)); *see also Shellenberger v. Summit Bancorp*, 318 F.3d 183, 189 (3d Cir. 2003) (at the summary judgment stage "the defendant need not prove that the articulated reason actually motivated the action") (quoting *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 501 (3d Cir. 1997)). If an employer provides a sufficient justification, the burden shifts back to the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton*, 707 F.3d at 426. To show pretext, a plaintiff "must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 427 (quoting *Fuentes v. Perskie*, 32 F.3d 763, 764 (3d Cir. 1994)); *see also Fuentes*, 32 F.3d at 765

(describing the standard for showing pretext as "plac[ing] a difficult burden on the plaintiff").

B

The *McDonnell Douglas* burden shifting framework also governs Title VII and PHRA retaliation claims in the absence of direct evidence of retaliation. *See Daniels*, 779 F.3d at 192–93. To establish a *prima facie* case for retaliation, a plaintiff must show (1) he engaged in protected activity; (2) the defendant took an adverse employment action against him; and (3) there was a causal connection between his protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006), *as amended* (Sept. 13, 2006).

At the *prima facie stage*, a plaintiff "must produce evidence 'sufficient to raise the inference that [his] protected activity was the *likely reason* for the adverse [employment] action." *Cavalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017) (quoting *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (emphasis added)). "[A] plaintiff may rely on 'a broad array of evidence' to demonstrate the causal link between [the] protected activity and the adverse [employment] action taken." *Id.* at 260 (quoting *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007). This may include evidence of "an employer's inconsistent explanation for taking an adverse employment action, . . . a pattern of antagonism . . . or temporal proximity unusually suggestive of retaliatory motive." *Id.* (internal quotations and citations omitted).

If a plaintiff meets the *prima facie* case requirements, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." *Moore*, 461

F.3d at 342 (citation and quotation marks omitted). If the employer satisfies that burden, "the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." *Id.* (citation and quotation marks omitted). "To survive a motion for summary judgment in the employer's favor, a plaintiff must produce some evidence from which a jury could reasonably reach these conclusions." *Id.* (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). A plaintiff asserting a retaliation claim "has a higher causal burden than a plaintiff asserting a claim of direct status-based discrimination under Title VII" and must ultimately "prove that retaliatory animus was the 'but-for' cause of the adverse employment action." *Carvalho-Grevious*, 851 F.3d at 258 (citing *Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

i

Post-employment retaliation claims are actionable under Title VII. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). The Third Circuit Court of Appeals has held "a former employee c[an] state a claim for retaliation arising out of post-employment conduct, so long as the retaliation affected the plaintiff's future employment opportunities." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1301 n.15 (3d Cir. 1997); *see also Boandl v. Geithner*, 752 F. Supp. 2d 540, 567 (E.D. Pa. 2010) ("In order to make a claim for post-employment retaliation, a plaintiff must show that he engaged in protected activity, that his former employer had influence over a subsequent employment related decision, and that his former employer made a retaliatory use of that influence to the detriment of the plaintiff's employment opportunities.") (citing *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 200–01 (3d Cir. 1994)). For example,

"retaliation claims have been permitted 'where the retaliation results in discharge from a later job, a refusal to hire the plaintiff, or other professional or occupational harm.'" *Boandl*, 120 F.3d at 1301 n.15 (quoting *Charlton*, 25 F.3d at 200).

C

Hostile work environment claims are not subject to the *McDonnell Douglas* framework because "there can be no legitimate justification for a hostile work environment." *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 n.11 (3d Cir. 2017). To succeed on a hostile work environment claim against an employer, a plaintiff must establish (1) he suffered intentional discrimination because of his race, color or national origin; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) the existence of *respondeat superior* liability. *In re Tribune Media Co.*, 902 F.3d 384, 399 (3d Cir. 2018) (quoting *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017)).

Discriminatory conduct "must be extreme to amount to a change in the terms and conditions of employment" to be considered severe or pervasive, *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)), and a work environment "must be objectively hostile, not just hostile in the plaintiff's view," *Greer v. Mondelez Glob., Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014). Courts consider the "totality of the circumstances" in determining whether "the conduct at issue is sufficiently extreme" to support a hostile work environment claim, which "'may include the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance.'" *Caver v. City of Trenton*, 420 F.3d 243, 262–63 (3d Cir. 2005) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "'[O]ffhanded comments[] and isolated incidents (unless extremely serious)' are not sufficient to sustain a hostile work environment claim." *Id.* (quoting *Faragher*, 524 U.S. at 788).

Employer liability for conduct creating a hostile work environment varies based on a plaintiff's claims. Where a plaintiff claims a supervisor is responsible for harassing conduct, an employer is "strictly liable for [the] supervisor's actions '[i]f the . . . harassment culminates in a tangible employment action.'" *In re Tribune Media Co.*, 902 F.3d at 399 (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassign[ing] with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 399–400 (citation and quotation marks omitted) (alteration in original). "[I]f no tangible employment action is taken," an employer may escape liability for a supervisor's conduct "by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance*, 570 U.S. at 424 (citations omitted).

Where a plaintiff claims a co-worker is responsible for harassing conduct, "employer liability . . . exists only if [(1)] the employer failed to provide a reasonable avenue for complaint or . . . [(2)] the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Tribune*, 902

17

F.3d at 400 (quoting *Huston*, 568 F.3d at 104). An employer "knew or should have known about . . . harassment if 'management-level employees had actual or constructive knowledge about the existence of a . . . hostile environment.'" *Huston*, 568 F.3d at 105 (quoting *Andrews v. City of Phila.*, 895 F.2d 1469, 1486 (3d Cir. 1990) (emphasis removed)). An employer is considered to have constructive notice of a hostile work environment "where an employee provides management-level personnel with enough information to raise a probability of . . . harassment in the mind of a reasonable employer." *Johnson-Harris v. AmQuip Cranes Rental, LLC*, No. 14-767, 2015 WL 4113542, at *10 (E.D. Pa. July 8, 2015) (quoting *Kunin v. Sears Roebuck & Co*, 175 F.3d 289, 294 (3d Cir. 1999)).

IV

A

PGW argues Dean cannot establish a *prima facie* case for his discrimination claim because even though he was subjected to an adverse employment action when he was fired, he cannot show he was qualified to remain employed with PGW. (Def.'s Mot. for Summary Judgment 6.) Dean understood he had to become a Cadet to keep his job but he failed to meet the requirements to do so because he did not successfully complete Cadet School. *See* (*id.* at 6–7 ("All Field Service Helpers who do not successfully complete Cadet School are terminated.")); (Pl.'s Ex. 1 at 49:2–12). PGW also contends Dean cannot show his termination occurred under circumstances that could give rise to an inference of discrimination. (Def.'s Mot. for Summary Judgment 6–8.) Dean's termination "was consistent with the collectively bargained requirement that he successfully complete Cadet School," and Dean cannot point to any evidence that

similarly situated individuals outside of his protected class were treated differently. (*Id.* at 8.)  In fact, the evidence shows one of Dean's African American Cadet School classmates was also fired for poor Cadet School performance.  (Def.'s Mot. for Summary Judgment 8); *see also* (Def.'s Ex. S, Scott Termination Ltr.).

Dean responds that an "atmosphere of harassment and intimidation pervaded" his Cadet School examinations and training, but regardless he "was plainly qualified to remain employed" because after he took his exams he was allowed to make service calls and use a PGW vehicle independently.  (Pl.'s Resp. to Mot. for Summary Judgment 13.)  Additionally, because the record shows he was harassed and intimidated beginning with his reporting Rutledge and continuing through Cadet School, a jury could infer from the timeline of events that his exams "were not fairly administered and that [his] October 2018 termination had been maneuvered . . . to get rid of a trouble maker." (*Id.* at 16–17.)

i

The record is ambiguous as to whether or not Dean was qualified to remain employed in October of 2018.  As an initial matter, the Parties assume without explanation that for Dean to succeed on a discrimination claim he would have to show he was qualified to be a Cadet, *see* (Def.'s Mot. for Summary Judgment 6–9); (Pl.'s Resp. to Mot. for Summary Judgment 11–20), even though his twelve-month probationary period as a Helper had not expired.  The evidence does not show that PGW forces Helpers up or out before the end of their probationary term or that Helpers get only one bite of the apple for promotion during their probationary period.

Even if Dean has to show he was qualified to be a Cadet, his qualification for that role remains disputed.  Dean's position that he was qualified because he passed his OQ test and received an independent route assignment is uncorroborated.  But PGW's claim that qualified individuals are solely those who pass the OQ test and complete Cadet School with an overall exam score of seventy and satisfactory field performance is supported only by documents and testimony that post-date Dean's termination.  *See* (Def.'s June 15, 2021 Ltr. to Court 2–3, ECF 61 (acknowledging record evidence of criteria for Cadet promotion consists of answers to interrogatories, termination letters dated November 7, 2018 and affidavits created for submission to the EEOC and signed in April of 2019)).  Viewing the evidence in the light most favorable to Dean, the Court cannot conclusively determine Dean's qualification for the Cadet role.

No reasonable juror, however, could infer Dean was fired because of his race.  *See Sarullo v. United States Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003) ("The central focus of the *prima facie* case is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin.") (internal quotations and citation omitted).  Notably, Dean fails to attribute most of the harassment or intimidation he experienced to his race, and instead suggests employees treated him poorly because they thought he was a rat.  The racially-charged comments Dean relies on bore no apparent relation to his termination.  Rutledge was fired more than one month before Dean after he allegedly called Dean a n***** lover, and Hudson purportedly used this expression *after* Dean's termination.  Moreover, the record does not show White was involved in Dean's termination.  And because Dean did not report White's "disgrace to the white race" comment to anyone, there is no evidence indicating

that anyone involved in the decision to fire Dean was aware of the comment or believed White felt that way about Dean.

Further, the evidence shows PGW fired Dean approximately two weeks after he finished Cadet School and shortly after management learned he scored a forty-eight on his final exam, a sixty-two overall and received a field evaluation in which a Supervisor, who did not at the time know Dean had any involvement in Rutledge's termination, *see* (May 27, 2021 Hr'g Tr. 13:19–14:2); (Def.'s SUMF ¶ 54); (Def.'s Ex. F 11–12), concluded he lacked the judgment and aptitude to safely perform a Cadet's job. None of the employees who purportedly harassed or intimidated Dean had any involvement in PGW's decision to fire him.[10] *See Walden v. Ga.-Pac. Corp.*, 126 F.3d 506, 521 (3d Cir. 1997) ("We have generally held that comments by those individuals outside the decisionmaking chain are stray remarks, which, standing alone, are inadequate to support an inference of discrimination."). And three days after Dean's termination, PGW fired an individual outside of Dean's protected class for his poor performance during Cadet School as well.[11] The evidence shows no connection between Dean's termination and his race, and Dean cannot establish the fourth element of his *prima facie* case.

ii

Even if Dean could make out his *prima facie* case, his discrimination claim fails. PGW's representation that it fired Dean because of his performance record, which

---

[10] At oral argument Dean's counsel stated he believes Gerard Gaydosh was involved in PGW's decision to fire Dean, (May 27, 2021 Hr'g Tr. 50:2–15), but no record evidence supports his belief.

[11] Dean claims the circumstances surrounding his classmate's termination for poor performance have no similarity to his purported poor performance and termination, but again, there is no evidentiary support for this claim. *See* (Pl.'s Resp. to Mot. for Summary Judgment 16–17).

includes failures of objective exams and failures to identify and locate gas leaks, is if true a legitimate, nondiscriminatory explanation for Dean's termination. *See* (Def.'s Mot. for Summary Judgment 6–9.) Dean fails to point to any evidence from which a jury could conclude this reason is pretextual. First, there is no evidence to suggest invidious discrimination was likely a motivating or determinative factor in Dean's termination because nothing in the record connects Dean's termination to his race. Again, a Helper outside of Dean's protected class was similarly fired for poor performance. And according to PGW, no other union employee, white or black, who participated in the Rutledge investigation has been terminated. *See* (Def.'s SUMF ¶ 50.) Dean does not dispute this claim. Second, the record provides no basis for a factfinder to disbelieve PGW's reason for firing Dean because even though Dean complains about the circumstances under which he was tested and trained, he does not dispute the overall Cadet School score he received or the content of his field evaluation.

Dean argues a jury *could* conclude PGW's explanation for his termination is pretextual because "the progression of events . . . from when [he] complained about co-worker Rutledge's racially-offensive conduct . . . which in turn led to public harassment and intimidation . . . and culminated in [Dean's] termination" suggest his termination "was just a further and final act of discrimination and retaliation." (Pl.'s Resp. to Mot. for Summary Judgment 19–20.) But this "progression of events," which purportedly occurred over at least a four-month period, *see* (*id.* at 19), still fails to connect PGW's decision to terminate him to any discriminatory animus. Moreover, it does not change the performance information PGW management received before it decided to fire Dean.

Dean's retaliation claims also fail. With respect to his claims alleging retaliation during his employment and through his termination, the Parties agree that before he was fired Dean engaged in two protected activities: (1) his participation in PGW's Rutledge investigation and (2) his October 30 human resources complaint. *See* (Def.'s Mot. for Summary Judgment 11); (Pl.'s Resp. to Mot. for Summary Judgment 20). They further agree Dean's termination was an adverse employment action. *See* (Def.'s Mot. for Summary Judgment 11–12); (Pl.'s Resp. to Mot. for Summary Judgment 20). But PGW argues even though Dean can establish the first two elements of his *prima facie* case, he cannot establish the third element because there is no record evidence of a causal connection between his engagement in protected activity and his termination. It reiterates that even if Dean can demonstrate a *prima facie* case, the evidence shows its sole reason for firing Dean was his performance record.

Because the record does not show how the conduct about which Dean complained on October 30 was race-related, it is unclear whether Dean's October 30 complaint constituted protected activity. *See, e.g., Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 792 n.10 (3d Cir. 2016) ("To be protected from retaliation under Title VII, [a] protected activity must relate to employment discrimination charges brought under that statute, implicating 'discrimination on the basis of race, color, religion, sex, or national origin.'") (quoting *Slagle v. Cty. of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006); *Gharzouzi v. Northwestern Human Servs. Of Pa.*, 225 F. Supp. 514, 540 (E.D. Pa. 2002) ("[A] general complaint of unfair treatment does not translate into a charge of illegal discrimination,

and it is not protected conduct under Title VII") (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 701–02 (3d Cir. 1995)) But assuming, *arguendo*, it is protected activity, a reasonable factfinder may be able to infer a causal connection between the complaint and his termination. The passage of mere hours between an employee's engagement in a protected activity and an adverse employment action can undoubtedly be unduly suggestive of a causal connection between both events. *See, e.g.*, *Lichtenstein v. Univ. of Pittsburgh*, 691 F.3d 294, 307 (3d Cir. 2012) (seven days unduly suggestive); *Jalil v. Avdel Corp.*, 873 F.2d 71, 708 (3d Cir. 1989) (two days); *cf. Parish v. UPMC Univ. Health Ctr. of Pittsburgh*, 373 F. Supp. 3d 608, 636 (W.D. Pa. 2019) ("unduly suggestive temporal proximity usually falls within periods of days or weeks").[12]

Nonetheless, for the reasons explained in Section IV.A.i, PGW has articulated a legitimate, non-retaliatory and performance-based reason for terminating Dean that he cannot show to be pretextual. And Dean cannot show he would not have been fired but-for his October 30 complaint. The uncontradicted evidence shows PGW management received Dean's Cadet School performance information before October 30, found it unsatisfactory and planned an October 30 meeting to discuss this with Dean before he ever complained to human resources. *See Lauren W. v. DeFlaminis*, 480 F.3d 259, 271

---

[12] Dean has not produced evidence sufficient to raise an inference that his participation in the Rutledge investigation was the likely reason he was fired. The several month period between Dean's participation in the Rutledge investigation and his termination is not unduly suggestive of a causal connection between both events. *See, e.g.*, *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.") Moreover, the evidence does not suggest Dean's termination was driven by retaliatory animus after Dean's report about Rutledge's conduct. Again, no one involved in PGW's decision to fire Dean is alleged to have been involved in Dean's harassment or intimidation after he reported Rutledge. Other white and black union employees reported Rutledge engaged in racially offensive conduct during PGW's investigation and none have been fired.

(3d Cir. 2007); *cf. Downs v. Locke*, No. 18-4529, 2020 WL 4584003, at *5 (E.D. Pa. Aug. 10, 2020) (finding plaintiffs' "simple denial" of fact to which defense witnesses testified "insufficient to create a genuine issue of material fact").  The evidence also shows Rohrer was not part of the decision to fire Dean, and he knew before he interviewed Dean on October 30 that PGW planned to fire Dean that day.  Management employees who decided Dean should be terminated and the letter management sent Dean after his termination say he was fired for unsatisfactory Cadet School performance.  The letter PGW sent Dean one week after his termination says the same.

ii

With respect to Dean's post-termination retaliation claims, even assuming each of the post-termination events Dean alleges occurred exactly how he describes them, he does not claim, and the evidence does not demonstrate, that any of them affected his future employment opportunities.  *See Boandl*, 752 F. Supp. 2d at 568 (granting summary judgment in favor of employer on post-employment retaliation claim where plaintiff "failed to allege a post-employment adverse action that caused harm to his employment opportunities"); *cf. Hare v. Potter*, 549 F. Supp. 2d 688, 697 (E.D. Pa. 2007) (denying request for equitable relief for post-employment retaliatory conduct and explaining "because defendant's alleged actions do not affect plaintiff's ability to seek new employment, plaintiff has failed to prove how defendant's actions constitute continued discrimination under Title VII").  Dean cannot succeed on his post-termination retaliation claims merely by relying on events that upset him.  *See Lin v. Rohm & Haas Co.*, 301 F. Supp. 2d 403, 405 (E.D. Pa. 2004) ("Title VII proscribes retaliatory post-employment conduct that relates to an employment relationship, not

'conduct in general which the former employee finds objectionable.'") (quoting *Nelson v. Upsala College*, 51 F.3d 383, 388 (3d Cir. 1995)).

C

Dean's hostile work environment claim fails too. As an initial matter, Dean cannot show he was subjected to severe or pervasive intentional discrimination because of his race. Again, there is nothing in the record showing the "rat" or "snitch" name-calling to which he was purportedly subjected or the false accusation against him regarding OQ test answers were race-based. Even if they were, that conduct "is not enough for a trier of fact to conclude that discriminatory conduct in the workplace amounted to a change in the terms and conditions of [Dean's] employment." *Woodard v. PHB Die Casting*, 255 App'x 608, 610 (3d Cir. 2007) (per curiam); *cf. id.* (KKK-related graffiti in office bathroom for over three months and numerous racially insensitive comments directed at plaintiff not severe or pervasive); *McGlone v. Philadelphia Gas Works*, No. 15-3262, 2017 WL 659926, at *14 (E.D. Pa. Jan. 19, 2017) (concluding evidence of repeated disability-related name-calling would be "insufficient, as a matter of law, to make out a claim for a hostile work environment").

With respect to the race-related conduct Dean alleges, Rutledge's n***** lover remark appears to have been an "offhand comment" insufficient to amount to a discriminatory change in the terms and conditions of Dean's employment. *See Faragher*, 524 U.S. at 788; *see also King v. City of Phila.*, 66 F. App'x 300, 305 (3d Cir. 2003) ("isolated and sporadic incidents" of plaintiff being subjected to a racial epithet, physically pushed and threatened about his work record not severe or pervasive); *Davidson v. FMC Techs., Inc.*, No. 4:15-cv-00756, 2016 WL 3944765, at *7 (S.D. Tex.

July 7, 2016) (supervisor's one-time use of term "n***** lover" not sufficiently severe or pervasive to warrant Title VII liability). White's "disgrace to the white race" comment amounts to the same. *See Obotetukudo v. Clarion Univ. of Pa.*, No. 13-0639, 2015 WL 1524460, at *12 (W.D. Pa. April 2, 2015) (finding plaintiff professor "fail[ed] to allege the type of 'severe or pervasive conduct' that is actionable as a hostile work environment under Title VII" where he claimed college dean called him a disgrace to his race and ethnicity and fellow professor called him "short as an ape"). Because Rutledge was fired for his racial remarks and no one knew about White's, the record lacks any evidence that either affected Dean's employment or work performance.

Dean also cannot demonstrate a basis for employer liability, at least as to Rutledge and White's comments. PGW provided a "reasonable avenue for complaint" about Rutledge, Dean's non-supervisory co-worker, which Dean utilized when he reported Rutledge's conduct to supervisors and to which management promptly responded by investigating Rutledge and subsequently firing him. *See Felder v. Penn Mfg. Indus.*, 303 F.R.D. 241, 244 (E.D. Pa. 2014) ("an employer may be directly liable for non-supervisory co-worker . . . harassment only if the employer was negligent in failing to discover the co-worker harassment or in responding to a report of such harassment") (quoting *Huston*, 568 F.3d at 104–05). White's comment did not effect "a significant change in [Dean's] employment status," so PGW cannot be held strictly liable for it, *see Tribune*, 902 F.3d at 399 (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). Moreover, since Dean never took advantage of opportunities to

report his encounter with White to anyone, no evidence shows PGW management had an opportunity to respond to it.[13]

PGW's Motion is granted with respect to each of Dean's claims against it. An appropriate Order follows.

BY THE COURT:


 */s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.

---

[13] PGW argues Dean cannot establish a basis for employer liability for the harassing conduct he faced in Cadet School because management did not know about this conduct until after they decided to fire Dean. *See* (Def.'s Mot. for Summary Judgment 23–24); (May 27, 2021 Hr'g Tr. 19:6–18.) This, however, is a disputed fact. Dean claims he reported Cadet School harassment to a supervisor three or more times during school, and PGW's only evidence this did not happen is the supervisor's testimony that he does not remember it. Regardless, because Dean has not demonstrated he was subjected to severe or pervasive discriminatory conduct, this issue is not material.

Dean also claims the Field Training Supervisor who evaluated him knew he was being harassed and intimidated during Cadet School, but he cites no record evidence to support this. *See* (Pl.'s Resp. to Mot. for Summary Judgment 28–29). At oral argument, counsel explained Dean's only evidence for this belief is a union representative's statement that "everyone kn[e]w[]" Dean was being harassed because "Dean is a loudmouth." (May 27, 2021 Hr'g Tr. 60:24–61:12.) If this statement exists in the record, it has not been provided to the Court. In any event, it is obviously insufficient.